THOMAS R. WILLIAMS,

*vs.*

OTIS J. G. WILLIAMS.

*Sussex, March* 2, 1922.

An uncle who had conveyed his home place and marsh to secure a loan taking a bond for reconveyance, employed his nephew much his junior in years to effect a sale and wrote to him a letter, stating, "You can have the marsh." The nephew secured a purchaser, took a reconveyance from the mortgagee, conveyed the home place to the purchaser, and retained title to the marsh. The uncle acquiesced in the situation for several years with apparent full knowledge of the facts. *Held:*

1. That a relationship of trust and confidence did not exist between the nephew and uncle.

2. That the question between them was solely one of contract whose terms were to be ascertained from the construction of letters of correspondence.

3. That a bill to enforce a trust will not lie.

BILL TO IMPRESS A TRUST ON REAL ESTATE. The bill seeks to impress a trust on certain lands held by the defendant and to compel conveyance thereof to the complainant.

On June 21, 1909, the complainant conveyed two pieces of land, known as his home farm located in Baltimore Hundred (which the evidence shows to have comprised about forty-five acres), and one piece of marsh land in the same Hundred comprising about sixteen acres to Elisha C. Dukes. The said conveyance, as shown by the proof, was made to secure the re-payment to Dukes of a loan of eight hundred dollars, with interest, made by him to the complainant. At the time of the conveyance, Dukes gave to the complainant what is described in the bill as a "conveyance bond," by which Dukes agreed to reconvey the lands mentioned, upon receiving from complainant the amount which might be due Dukes, within a period of two years. The complainant as well as defendant fixes January 1, 1911, as the end of the redemption period. The so-called "conveyance bond" is not in evidence.

After making the conveyance and agreement with Dukes, the complainant soon thereafter, if not immediately, left the State of Delaware, and did not return to reside until about 1919. In the meantime, however, it appears that he spent about two months visiting his old home in 1916, at which time he visited the defendant, who is his nephew. The defendant likewise visited the complainant in Cape Charles, Va., and the two corresponded with each other.

In the latter part of 1910, one Lynch opened negotiations for the purchase of the home farm of forty-five acres. At that time the complainant was living in Indiana. This resulted in the appointment by the complainant of the defendant, Otis J. F. Williams and his uncle (complainant's brother) Arthur E. Williams, as attorneys in fact to redeem the forty-five acres from Dukes and sell the same and make proper deed therefor in his behalf. The power of attorney is dated December 5, 1910. Accompanying the power of attorney was a letter to the defendant in which the complainant said:

"Well, Otis, we have just had this paper drawed up and I hope it will prove satisfactory and you can have the marsh and sell Mr. Lynch the farm for 9 hundred and you and uncle [meaning Arthur E. Williams, complainant's brother] go ahead and do what you think is best."

Upon receipt of this, the defendant proceeded to endeavor to sell the farm. Lynch refused to buy and the defendant, his uncle Arthur appearing to assist, arranged to sell the forty-five acres to Samuel D. Bennett for nine hundred dollars. In order to do this, the defendant had to raise the money necessary to pay off the debt owed by his uncle Thomas to Mr. Dukes. Defendant did this by borrowing money and giving his own notes for all except something under fifty dollars in cash, which he had in currency of his own. Having made the financial arrangements, he paid Dukes the amount he claimed was due, and secured from him a re-conveyance of all the land, taking title in his own name. This was subsequent to the expiration of the redemption date. Thereafter defendant conveyed the "home farm" of forty-five acres to Bennett for nine hundred dollars.

He now has title in himself for the sixteen acres of marsh land, which he contends he was to have for his services. It is with respect to the title to this sixteen acres of marsh land, that the present bill is filed. Otis contends that his uncle gave him this for services which he rendered in the sale; his uncle, the complainant, contends that he never intended that Otis should have the title to the marsh, and that the same rightfully belongs to him. Hence he prays that Otis be decreed to hold the marsh land for his benefit and that he be required to make conveyance thereof to him.

*James M. Tunnell*, for the complainant,
*Woodburn Martin*, for the defendant.

THE CHANCELLOR. The defendant was undoubtedly acting in behalf of his uncle, the complainant, as his agent to effect the sale of the farm. In order to redeem the farm of forty-five acres, it was necessary to pay off Mr. Dukes in full. When this was done, the marsh as well as the farm was free of all claim on the part of Dukes. There is no dispute concerning the conveyance of the farm to Bennett. Proper accounting of the proceeds was made and

the complainant received a surplus above the claim of Dukes of one hundred dollars. If under the letter which the complainant wrote to the defendant, by which he induced the complainant to undertake the business for him, Otis J. F. Williams was not to receive the marsh as compensation for his trouble, then of course it is plain that he had no right to have conveyance thereof made to himself. If the contrary be true, it is equally plain that he is entitled to hold the marsh as his own. The decision of the case must, therefore, turn on the meaning of the letter which directed Otis to redeem the land.

While it is true that the relationship of principal and agent raises a situation of trust and confidence by reason of which the acts of the agent in cases of dealings with respect to the principal's property will be carefully scrutinized and more strictly judged than if no such relationship existed between the parties, yet this case does not seem to me to fall within that class. For in this case, it is not the behavior of the agent in the performance of his duty and the manner in which he carried out his commission that is involved, so much as the question of what were the terms of his employment. If under the terms of his employment he was to receive the marsh as his compensation, then the answer to the main question is plain. The converse is, as before stated, likewise true.

Therefore, the thing to be determined is this, viz.: what is the construction to be put on the letter which the complainant wrote the defendant in which he said "you can have the marsh and sell Mr. Lynch the farm for 9 hundred"?

It is not to be assumed that the defendant was to raise the money to pay off his uncle's debt, find the purchaser and go to all the trouble incident to attending to the sale, pledging his own credit and assuming all the burden, without some compensation. He was told that he could "have the marsh." I cannot understand what this language could mean unless it be that the marsh was to be his for his compensation. He so understood it and accordingly took title to it. The deed to him was made January 9, 1911, and recorded February 13, 1911. There was, therefore, nothing clandestine about his actions. The defendant testified that the complainant knew of his taking the title and approved of

it. The complainant denies this. However this may be, I am at a loss to understand how the complainant, revisiting with his people for about two months in 1916, having a brother who participated to some extent in the settlement with Dukes and who must have known of what had been done, could have remained ignorant of the fact that Otis had taken title to the marsh until his return home in the latter part of the year 1919. It would appear that information must have come to him from some source. He waited, however, until January, 1921, before making complaint against the transaction.

If the value of the marsh was so great as to amount to a shocking consideration for the  services performed, there might be some room to contend that the letter referred to could never have been meant to tell Otis that the marsh would be given to him absolutely for his trouble. The testimony as to its value is conflicting. The defendant testified that at the time it was not worth over one hundred dollars and is now worth not over one hundred and fifty dollars. The complainant testified that it is now worth four or five hundred dollars. I incline to the view that the value of one hundred dollars at the time of the transaction does not seem to be out of the way. The home farm was sold at twenty dollars an acre. It would, therefore, seem reasonable, by comparison, that the marsh of sixteen acres should not be worth over one hundred dollars, or a little over six dollars an acre.

The defendant is the nephew of the complainant, and considerably his junior in age. At the time of his employment, the defendant occupied no position of trust or confidence towards the complainant. The statement to him, therefore, on the part of the complainant, that the defendant should go ahead and sell the farm and "you can have the marsh," was a statement made by complainant which can in no sense have attributed to it any shade or color of meaning arising from a relationship of trust or confidence between the parties. In construing wills, the word "have" has been allowed the effect of passing the full quantity of title. *Guthrie's Lessee v. Guthrie*, 1 *Call* (*Va.*) 7. In such cases the question, of course, is one of intent, to be gathered from the whole instrument. In this case the question is one of construing the terms of a contract of employment. The ordinary mind would, under

the circumstances understand the letter of the complainant as the defendant understood it. He acted upon the understanding, and some eleven years later, notwithstanding the openness of his conduct, the complainant seeks to question it.

Let the bill be dismissed with costs on the complainant.

A decree will be prepared accordingly.